Good morning, Your Honors. My name is Karen Kohler. I'm with the firm of Stripmatter Tester Waylon Coluccio in Seattle, Washington. And I represent Tara and Don Sadler, who I'll refer to as the Sadlers, in a claim against State Farm that was dismissed on summary judgment. In listening to the last argument, I was struck, because that was my feeling when I read the opinion from the Court in this case, that the facts as recited were basically those cited by the defendant in their brief, and not the plaintiff's version of the facts in this case. This case has resulted in Tara Sadler being in a wheelchair since 2005, and it highlights insurance and medical issues that are very much before all of us in this present day. I do want to get right to your questions, though, without further ado. I think that this is always the case, and sometimes when we jump right to the legal issues, of course people presume that we're insensitive to all of the issues that you're talking about. And that certainly isn't the case, but obviously we have to decide cases based on the legal issues. When I distill your arguments down to something, it seems that for you to prevail, you have to be able to establish a duty to preauthorize the surgery under the law, under the insurance policy, and then whether it be under, you know, good faith. It all seems to boil down to that for me. If there is no duty to preauthorize surgery in this case, don't the other issues fall? Let me address the preauthorization issue. Well, but that's what I'm just saying. Doesn't it distill down to that? Okay. I don't see how you – if you can't establish a duty to preauthorize, I don't see how any way that you fashion your argument you can prevail. If you do, then that seems to me what you have to do. All right. I believe that on the issue of the duty and preauthorizing that, in fact, here there is a semantical issue because State Farm actually pended the entire claim. They stopped it. So there's different language being used, and it's interwoven, preauthorization versus pending. And we focus more on pending during the summary judgment motion briefing that you have before you. And the preauthorizing, we try to flesh it out more. But in good faith, good faith law in the State of Washington is that the duty doesn't even have to the breach of good faith duty creates liability even if the contract does not explicitly mention that duty. Well, except for the fact this isn't – okay, it's a PIP policy, as it were. It is a PIP. It's not a health insurance policy. So if it were a health insurance policy, that argument would be a different one than it is here. So it seems to me with this policy, you first have to deal with the language of the policy. You know, what did they buy? What did they buy? And you have language in the policy that says something about them having a duty to pay after bills are submitted to them. So, you know, everything to me seems to boil down to you've got to establish somewhere a duty to preauthorize. And so do you get it in the language? Where do you get that duty? Well, in the record, Ms. Smith, when she spoke to Mr. Sadler, after he told her that his wife needed the immediate surgery, she wrote in her own notes that he was requesting preapproval. At that point, she did not say, well, I'm sorry, we don't preapprove. She didn't – when the doctor or the doctor's office talked to them and she said we are pending, we are stopping the entire claim at this point, you have to wait now for an IME. She didn't say you need our permission to preapprove. What they said was we have stopped the entire claim. Okay, but if you go back to the language of the policy, they are entitled to have an IME. What is the IME for? Is the IME to determine whether the damages that they're required to pay are related to an accident or, you know, I mean, the language of the policy is really important here, obviously, because the language of the policy is going to be controlling unless it's ambiguous and then we're going to look at other things. So what is the IME for under the language of the policy? The language is to determine if it is reasonable and necessary and related to the incident. Okay, which was a little bit of an issue here because apparently they were in what initially didn't appear to be an accident but was determined to be an accident because I guess they didn't actually collide, right? It was a breaking, a fast breaking. There's a police pursuit and a very sudden slamming on of the brakes. Okay, so where is the duty to preauthorize? How are you putting that together? It's not the language of the policy then, as I'm understanding you to say. My position is that this is not, as you said, this is not a healthcare policy and people are talking in different language. The doctor talks in terms of preauthorizing. She simply calls to say, can you preauthorize? State Farm doesn't respond in preauthorizing language. The insured calls State Farm in preauthorizing language. They are, again, very simple folk. Can we have the surgery? They ask even for permission to see a chiropractor. They don't know. So, counsel, what is the genesis of the bad faith argument that you're making? What's it predicated upon if it's not a duty to preauthorize? What is it? It's a duty not to stop. They completely stopped the payment and they shut down everything and had nothing other than going to a default IME. And the way that it happened was very slowly. But doesn't the contract say that they will pay the claims as made? And when the bills were submitted, they paid them. So how does that constitute bad faith? Well, that's a contract, the contract claim which we did not appeal. But what happened here was that they stopped the doctor from performing the surgery by speaking in a different language. So there is a freestanding claim for bad faith based on what duty, though? The duty of good faith and fair dealing. They were told that there was an urgent issue, and instead of handling it with urgency in mind, they went to a default mechanism that delayed things until it was too late. Because when she initially saw the doctor... But that didn't stop the policyholder from going ahead and getting the treatment. Well, putting yourself in the policyholder's shoes, though, and what they testified is they were trying to do what they were supposed to do. They were told that they had to wait. They waited. They weren't told go get more treatment by state farm from someone else. They were told it's all being stopped. You have to wait for a medical exam. I mean, they were trying to determine whether or not the claim was valid, but not whether or not the services could be provided for sure. They violated their own policies, first of all, by telling the doctor that they were putting a hold on everything. And the doctor knew that this was the only means of any kind of insurance because they were uninsured other than PIP. So state farm's manuals don't give them permission to go telling the health care providers we're putting holds on things, but they did that, and that had the effect of stopping everything. But if the PIP is not a health insurance policy, you know, that's... It's a hybrid. It provides health insurance for people who are injured as a result of motor vehicle collisions. And in this case, it was the only health insurance available. What was the period of delay? I remember seeing somewhere it was 36 days. All of this panned out within 36 days. Am I misrecollecting, or is that correct? All right. The timeline of the delay is that in June 9 of 04 is when they actually had MRI on June 1. They came to Seattle for the consult with the neurosurgeon, who then referred it to the second neurosurgeon. And so from June 9 until July 29 is when the actual surgery happened. But July, I think, 22nd or 20th. About 36 days? Correct. It was a short window. Isn't there evidence in the record that state farm actually attempted to expedite its processing of the claim and tried to move the IME up from the regular routine time in order to accommodate the plaintiffs here? No. What happened was that there was two adjusters involved, a very bottom-low adjuster and then one that was a little more sophisticated. The first adjuster scheduled them for a regular medical exam with the wrong doctors, and two of them. So it was pushed out until, I think, July 29. The second adjuster then got involved. However, there was a two-week delay where it was transferred where nothing happened at all. So the second adjuster got involved and said, these are the wrong kinds of doctors. We just need one doctor. She scheduled it, and that took eight days. So the plaintiff's theory was you could have had an IME within a week or eight days if you'd chosen the right doctor to begin with. How can that be bad faith? At most, it's negligence. It is negligence. But negligence doesn't get you to a bad faith claim. Well, it's the combination. And bad faith, I'm sorry, Your Honor, I was going to get you the quote on the adjuster saying that she couldn't say that it would have taken her any longer to get just one doctor. She'd use the right doctor. She doesn't know what would happen because she didn't do it. But negligence doesn't matter if it was just a matter of negligence, does it? What case do you have to support your argument that bad faith can be predicated on negligence? Bad faith does not require an intentional act. Bad faith is putting your interests above that of the insured. Okay. What's your strongest case to support your argument that the mix-up in getting the correct independent medical exam provider will support a claim of bad faith? What case, Authority, are you relying on? Well, of course, there's no exact case on that point. Is there one close? The closest case, I guess, the only PIP case is Van Noy, and that just talks about the fiduciary duties, the heightened quasi-fiduciary duties to an insured. Wasn't that a breach of contract case? That was a PIP case. It was not breach of contract. It was a bad faith insurance case because of medical reviews. This goes back to what Judge Callahan asked you, though. If they have a right to an IME and the policy specifies we won't pay until after, after the procedure is done, then I don't understand how you can say it's bad faith for them to exert their rights under the policy. And it sounds to me like you can see that there was some effort to move this along, not to drag their feet deliberately in order to avoid paying it or hope something worse happens to your client. I just don't see the bad faith in that. They have rights under the policy that they exerted. They wanted to have an independent medical exam. It looked like it was expedited, and in the end, if I follow the record, they ended up paying for the surgery up to the policy limits. There's a $25,000 policy limit, and they paid $18,000 on the first surgery. So where's the bad faith in that? Of course, when they paid it at the end, she was already in a paralyzed state because of the delay. But according to Rob Dietz, who was the insurance expert, he said that you don't have to have an IME. It's in their discretion. So they had their discretion. But they also had nothing, and I do want to reserve two minutes, they had nothing other than this default mechanism that they would use. The adjusters had no special knowledge. They had these ICT trainers or specialists that they could have consulted. The policy, the contract said that they could have talked to the doctor if they had any confusion whatsoever. They could have talked to their own in-house people. They could have done a whole number of things when they're confronted with spinal cord impingement, urgency, and they didn't do anything urgent. Do you think it was bad faith for them to assert their right to have the IME in this case? I think they should not have told, what I think is they should not have told the surgeon that because it stopped everything. They had no right to do that. It effectively stopped everything, and that they should have had an expedited method to deal with an urgent situation rather than just putting it into a default, we're going to get to an IME. And, you know, it took them a week to even start the process of scheduling it. Mr. Sadler called a week later and said, what's happening? And they said, well, we're going to schedule one. And he said, when? So I just went way over my time. I did want to reserve two. You still have a minute and 30 seconds, but while you're waiting, would you look at page 490 of the Van Noy cases and then tell me when you come back whether or not you think it was a breach of contract case or not. We'll give you two minutes on rebuttal. Okay, thank you. Good morning. May it please the Court. I'm Joseph Hampton. I represent State Farm. I'm accompanied by Daniel Sirey. I want to focus in on the questions that the Court has posed today, and the most important one is preauthorization. There is no duty to preauthorize. In Washington insurance law, a duty that devolves upon an insurance carrier can come from a number of different places, and the first place we look is the insurance contract. There is no obligation or even the suggestion of an obligation to preauthorize. I'm curious as to why this interchange started, and why was there the discussion about, you know, surgery was needed, let's schedule an IME, put everything on hold while we find out what's going on. If there's no preauthorization requirement, why did all of that happen? And why didn't State Farm just let the plaintiffs go ahead and do whatever they were going to do medically and then decide once the claim came in whether to pay it? That's what they did do, Your Honor. In fact, if you look at the history that's laid out in quite explicit detail by the district court, what happened was this. When the claim first came in, she said, I have a neck strain, and she was having chiropractic care, and before that she was having physical therapy. Out of the blue, State Farm gets a call that says, I've had an MRI and I have a bulging disc. Excuse me, her husband says that. And what he says is, we need immediate surgery. But actually that's not what the doctor said. Well, regardless of that, what was State Farm's reaction to that? State Farm's reaction is, we are going to pay all of your bills current, number one. Number two, on page 54 of the excerpts of the record, since you had asked earlier, the claim handler says, we can't pre-approve. We just don't do that. And so they said, we will order page 54, ER 54, the entry number 44 at the top. And Dr. Srinivasan, the neurosurgeon, never called State Farm and told them that it was urgent. In fact, she said at that time that it was, if it had been emergent, she would have sent Tara Sather down the street to Swedish Hospital and had her seen that day. But she didn't. Well, I guess, did you create, this is coming to the no good deed goes unpunished. Did you create a problem with, if the plain language says you pay after the bills are submitted, did State Farm somehow interject themselves into the process of pre-authorization here? You know, if State Farm, if that was your position, why didn't they just say, hey, do your medical care and then submit your bills and we'll make a determination at that point. Don't delay what you need to do based on us because we don't, you know, we're not in the business of deciding what treatment you need. Our business is to decide what we pay under this contract, which is not a health insurance contract. That's correct, Your Honor. It's not a health insurance contract. And we have a bunch of people who are adjusting PIP claims. And what they know is that they're not in the position to tell the insured what to undergo in terms of treatment. And so that's why Elise Smith said we don't pre-authorize. But it's also interesting. But it didn't say we don't pre-authorize. It said we cannot pre-approve. That's different than saying we do not pre-approve. Okay. That's right. We cannot pre-approve. And I would submit that it is the same thing. If the contract, if the policy does not give State Farm the right to pre-authorize, then she cannot, the adjuster cannot pre-approve. Well, in context, it's a fair reading to say, you know, we're going to check with another doctor to see if this is medically necessary before we decide whether or not we're going to pay it, which is, in essence, pre-authorization. No. It is, I respectfully disagree. What it is, it is a tool used by an insurance company to determine whether benefits are payable. This is an indemnity contract. And, Judge Callahan, you recognized earlier on this is a different critter than a health insurance policy. But why, if you would have really wanted to sit on your rights as you define them, why didn't you just say, hey, go get your health insurance, go do whatever you've got to do for yourself, and after you do it, then we'll, you submit the bills and we'll determine which ones we're going to pay. Well, we could have. Could you have done that under the contract? That's essentially what they did. The only thing is this. I thought you talked about getting a second opinion. Didn't she give her the money before she had the surgery? Didn't she just release all of it before? No. No? Because, according to the contract, it says we'll pay within 30 days of it being incurred. Now, it's also important to recognize that right after State Farm said, we don't preauthorize, this is a totally different diagnosis than you presented with originally, plaintiff went out and got counsel at that point. And counsel never harped upon State Farm to do something differently. In fact, they cooperated in getting the IME scheduled. That's what they did. They never objected to the methodology. Well, if I understand your position, your position is that you don't preauthorize, you don't have a duty to preauthorize under that, that you have a duty to pay within 30 days of bills being submitted and you have a right to request an IME to ascertain whether the bill, whatever they're requesting the bill being paid for is related to an accident. Is that right? And also covered within the policy, correct, Your Honor? Okay. And so that, and your position further is the reason that she ended up with the injuries that she has is because she chose to delay the surgery, not because you delayed in anything that you were required to do under the contract. Exactly, Your Honor. And this goes to the other point, not only is there no obligation to preauthorize because it doesn't exist anywhere, but there's no causation. Judge Zille recognized there's nothing stopping this woman from going to a hospital and getting treated if this was indeed a problem. And that is a glaring lack in this case, is that nothing State Farm did or could have done could have put up a blockade in front of this woman going into an ER and getting the treatment that she said she needed. In fact, after the IME, State Farm's IME doctor sent her to the emergency room. The emergency room doctor says, I have no idea why this woman is here and wants to wait until she can get surgery in Seattle later at some other date. He asked her to go down the hall and see a neurosurgeon. She refused to do so. But she had all kinds of opportunities to go get surgery if it was emergent. In fact, she had a doctor right here in Seattle that had seen her. She never called back and told the doctor, I've lost the use of my legs. In fact, at the time that her husband called State Farm, it was still a neck injury that had radicular symptoms down the arm. It was no paralysis of the arm. If you have no duty to preauthorize, does causation matter? Not really. But there has been an argument from their side that I guess Mr. Dietz said there was a duty to give a noncommittal committal. So we had to deal with that on summary judgment. And we told the court below that even if you accept everything they're saying about misconduct, you still have to create a causal link. Proximate cause in Washington, as probably in most states, has a couple of elements. There's factual cause and there's legal cause. And that factual cause is there has to be a direct and unbroken sequence from conduct to injury. You don't have that here because all State Farm did was said, oh, looks like you have a different injury than you told us earlier. It's more serious. We don't know if that is related to any accident. We need an IME. But if the PIP is a health insurance policy and you had a duty to authorize, then couldn't you show a causal link? If it is a health insurance? Well, it's not. I'm doing a hypothetical here for you. Not really because you can't cram the two concepts together. And earlier in this argument you pointed that out, Your Honor. If you look at our policy, it's an auto policy that has a lot of different coverages in it. And five pages of it, just five pages, talks about PIP. And it's not just medical. It's like if you're hurt and you can't clean your house, then you can get these services. Or if you're hurt and you can't work, then you get some wage loss. A health insurance policy, at least my summary health insurance policy I get from work, is 80 pages. And that's not even the entire contract. Health insurance is a totally different concept than an indemnity contract that we're dealing with here. And, in fact, if you look at it in context, it makes perfect sense. You shouldn't get preauthorization for wage loss, which is a PIP benefit, because you don't know if you're going to be off work next week. Is there any evidence in the record that a State Farm representative at any point shut down the prospect of plaintiff getting surgery or told a doctor, don't do this, we're not paying for it, anything like that? None whatsoever. This factoid of put everything on hold comes from Donald Sadler. And it's at best hearsay. He said that Dr. Srinivasan said that State Farm put everything on hold. Dr. Srinivasan couldn't even remember calling State Farm. She's all over the place. She said she thought she did, but she couldn't remember. Yes, she couldn't. But she also testified in her deposition that if a patient needed surgery, she would find a way to get it done. Certainly she's not going to let State Farm tell her that she can't prevent her patient from being paralyzed. It's ludicrous to go there. Just to circle back to the whole concept of bad faith, Judge Zille talked about the duties devolving upon an insurance carrier to act in good faith at some length. And what he came up with is that it was essentially this. Throughout the handling of this claim, State Farm acted in a reasonable fashion. I want to point out a couple of things to you about that. Number one, it is reasonable to ask for an IME when you were originally presented with what seemed to be an X-strain, and then suddenly you're told, no, no, no, this is a bulging disc with ridiculous symptoms down the right arm. That's perfectly reasonable. Secondly, State Farm actually got on the stick and got the IME scheduled in a fairly quick fashion. Thirdly, there seems to be a suggestion, and Judge Zille disposed of this fairly quickly, there seems to be a suggestion that it was incumbent upon State Farm to do a different investigation early on. Well, there was no accident. Why should State Farm go out and take pictures of vehicles that haven't collided? Secondly, what would they have investigated in those first two months? There was a complaint, or excuse me, a new claim filed. State Farm received it and started paying the bills. Giving all inferences in favor of the appellant plaintiff, when was there a first indication that this had to do with an accident? I guess it was, well, when the claim was submitted, because when the insured comes and asks for the coverage, the insured essentially says there was a motor vehicle accident. So, but State Farm, even though there wasn't a collision, State Farm treated it like an accident because the plaintiffs, or the insured, said I was in my car, there was an event, and I was hurt. So, they accepted her word and started paying. So, they paid those payments for the physical therapy, chiropractic type. Exactly, exactly. And throughout this, there's been another suggestion that the State Farm claim handlers were under-trained because they didn't recognize that she could have possibly had a bulging disc in her neck. Well, that's not their job. Their job is to review records and gather other information and pay the bills. The job, the responsibility to determine how badly someone is hurt devolves upon the plaintiff's own doctor, the plaintiff's physical therapist, the plaintiff's chiropractor. It's not State Farm's job to re-diagnose what her own treating physicians have given her. It's not State Farm's job to question the diagnosis of those folks. It's their job. So, the right to the IME is what then? The right to the IME is to determine whether the expense was reasonably necessarily and related to the accident, and the expense was incurred within three years is another requirement. I notice that my time is just about out. Judge Zille was correct. He was correct for a number of reasons, one of which we didn't mention that is a new reason here is that plaintiffs really put up no objection to or did not argue pre-authorization below. They should not be allowed to do it here. And for a number of reasons, Judge Zille should be affirmed. Thank you for your time. All right. Thank you, counsel. Rebuttal. I'll give you two minutes. Two minutes. Thank you, Your Honor. I did not have Benoit with me, but I was thinking on it, and I do remember I thought it was a combination contract, bad faith, with respect to the PIP. The document with respect to telling the surgeon that the claim was delayed is on ER 121, where it says delayed approval for surgery. She says that's my note. The date and signature is mine. I'm sorry, I missed the last part of what you said. She was on ER 121. She's talking about her writing. That's the doctor's statement where she's saying that the approval for surgery was delayed. Yes, she is. Her state form. Her state form. And I do want to indicate that we did spend more time discussing pre-authorization in the brief, especially with respect to Oregon law. And then I want to finally address the issue of bad faith. Why is there bad faith here, and can negligence be bad faith? In this case, when you have a simple person that has a problem who's speaking through their husband, and you tell them things, you're supposed to be acting in a quasi-fiduciary duty. These are not just administrators. This is an insurance company. And they did not say go, you know, just ignore what we're saying. It's all up to you. You go find whatever health care you need. They were telling these people to wait. Just wait. This is our process. This is what we're going to do. And our experts said this was a default process. They had no mechanism to give this case special attention that it needed and deserved. And that's what is the crux of the bad faith in this case. They told them to wait. They told the doctor that everything was going to be stopped. And everyone relied upon that to their detriment. All right. Thank you, counsel. Thank you.  The case is argued and submitted for decision by the court.
judges: Burns, Rawlinson, Callahan